UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TALON PROFESSIONAL SERVICES, LLC,

Plaintiff,

-v-

CENTERLIGHT HEALTH SYSTEM INC., SQUILLION SYSTEMS LLC, OKAYA, INC., JOHN DOES 1–10, and ABC CORPS. A-J,

Defendants.

20 Civ. 78 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Talon Professional Services, LLC ("Talon") provides computer consultants for hire on a temporary basis. It alleges here that its client, CenterLight Health System Inc. ("CenterLight"), and two of its subcontractors, Squillion Systems LLC ("Squillion") and Okaya, Inc. ("Okaya"), breached their agreements with Talon by cutting out Talon and continuing to work together without paying Talon its contractually due fees. Talon brings claims against all three defendants for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual relations, and unjust enrichment.

CenterLight and Okaya now move to dismiss Talon's Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). For the reasons below, the Court grants CenterLight's motion in its entirety, and grants in part and denies in part Okaya's motion.

# I. Background

## A. Factual Background[1]

### 1. Parties

Talon is a New Jersey LLC whose two members are citizens of Hawaii. SAC ¶¶ 2–3. It is "engaged in the business of providing skilled computer consultants for hire." *Id.* ¶ 2.

CenterLight is a New York not-for-profit corporation that provides healthcare services. *Id.* ¶ 4; First Agreement at 1. Squillion, a New Hampshire LLC whose sole member is a resident of New Hampshire, provides temporary staffing services. *Id.* ¶¶ 5–6, 30. Okaya, a New York corporation, also provides temporary staffing services. *Id.* ¶¶ 7, 49.

### 2. Talon's Dealings with the Defendants

#### *a. Talon's Contracts with CenterLight*

On or about October 1, 2014, Talon entered into a Consulting Agreement ("First Agreement") with CenterLight. It provided, among other things, that: (1) Talon would provide candidates for employment at CenterLight, *id.* ¶¶ 19–20; (2) CenterLight would inform Talon if it decided to extend an offer of employment to a Talon candidate, *id.* ¶ 21; and (3) CenterLight would pay Talon a recruitment fee for any candidate "who learned of the [CenterLight] job

---

[1] The Court draws its account of the underlying facts from the Second Amended Complaint, Dkt. 40 ("SAC"), and documents that it incorporates by reference, *see DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."). The SAC incorporates by reference the contracts at issue, namely the Consulting Agreement and Independent Contractor Agreement between Talon and CenterLight, *see* Dkt. 27 ("Hsi Decl."), Exs. A ("First Agreement"), B ("Second Agreement"), and the Subcontractor Agreements between Talon and Okaya, *see* Dkt. 52 ("Roddam Decl."), Ex. A ("Subcontractor Agreement"). The Court accordingly considers these contracts in assessing the motions to dismiss under Rule 12(b)(6). In resolving those motions, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

opportunity through the direct efforts of [Talon]," with the fee equaling 20% of the candidate's first-year base salary, First Agreement at 2; SAC ¶ 22. The First Agreement was to automatically renew on an annual basis until terminated by either party upon 15 days' written notice. SAC ¶ 23.

On October 6, 2014, CenterLight and Talon entered into a separate agreement, the Independent Contractor Agreement ("Second Agreement"). *Id.* ¶ 24. In it, CenterLight retained Talon to provide candidates who would perform services pursuant to Statements of Work ("SOWs"), with CenterLight reimbursing Talon at an agreed-upon hourly rate or on a fixed-price basis, depending on the specific services rendered. SAC ¶¶ 25–26; Second Agreement § 3. Section 4 of the Second Agreement, "Temp to Perm Placement," stated that if Talon's candidate applied for and was selected to fill a permanent position at CenterLight, CenterLight would only owe an additional "placement fee" to Talon if the candidate had worked at CenterLight for less than 17 weeks at the time of hire:

> CenterLight finds it necessary to hire personnel from time to time. Should [Talon]'s personnel apply and be selected for such vacancy, CenterLight shall pay a placement fee to [Talon] as follows:
>
> > If such [Talon] personnel has been placed with CenterLight for a period of seventeen (17) weeks or less the fee shall be 20% of the annual salary of the personnel hired.
> >
> > If such [Talon] personnel has been placed with CenterLight for a period of more than seventeen (17) weeks, [Talon] will be notified of the hiring, and CenterLight may separately engage, contract with, or employ such personnel without any further liability to [Talon] for such personnel . . . .

Second Agreement § 4; SAC ¶ 27. The Second Agreement included a "Mutual Non-Solicitation Provision":

> Except as set forth in Section 4 regarding temp to perm placement, during the term of a SOW and for a period of twelve (12) months thereafter, neither party shall solicit for employment any employee of the other party who was engaged in or

> became known to the other as a result of the performance of such SOW, provided that the foregoing shall not be deemed to prohibit general, non-targeted solicitations for employment.

Second Agreement § 14; SAC ¶ 28. It also included a non-exclusivity provision, allowing CenterLight to "engage the services of any individual or entity that competes with [Talon] or offers services similar to those offered by [Talon]." Second Agreement § 15. Finally relevant here, it included the following integration clause:

> This Agreement, any Exhibits, and any amendments hereto, the NDA and CenterLight's Business Associate Agreement shall constitute the entire agreement between the parties hereto and set forth the entire terms and conditions under which this Agreement will be performed. There are no other agreements, oral or written, between the parties with respect to the subject matter of this Agreement, and all oral and written correspondence relating to the subject matter hereof is superseded by this Agreement.

*Id.* § 22.

*b. Talon's Subcontractor Agreements*

Talon then entered into Subcontractor Agreements with Squillion and Okaya. SAC ¶¶ 29, 34. These provided that Squillion and Okaya, acting as subcontractors of Talon, would provide staff to Talon's clients. *Id.* ¶¶ 30, 35. The Subcontractor Agreements included a covenant against competition, providing:

> Subcontractor and Subcontractor's personnel shall not directly or indirectly, solicit or provide services to any customer or Client for whom Subcontractor provided services through Talon Professional Services under this Agreement.

Subcontractor Agreement § 11;[2] SAC ¶¶ 32, 37. The Subcontractor Agreements also required the subcontractors to

[2] The SAC alleges that Talon entered into similar agreements with both Squillion and Okaya, but, on the pending motions, the parties have submitted only Talon's agreement with Okaya. Accordingly, although the SAC alleges that each agreement contained materially identical terms, *compare* SAC ¶¶ 30–34, *with id.* ¶¶ 35–38, citations to the Subcontractor Agreement in this opinion refer only to Talon's agreement with Okaya.

> cause each and every person who they assign to perform the services contracted for under this Agreement to sign a separate non-disclosure agreement and covenant against competition to ensure compliance with this Subcontractor Agreement.

Subcontractor Agreement § 9; SAC ¶¶ 33, 38.

*c. The Temp Placements and Alleged Breach*

Acting as subcontractors of Talon, Squillion and Okaya then, respectively, placed Altheruddin Mohammed ("Mohammed") and Mahesh Yammanur ("Yammanur") with CenterLight as computer-consultant employees. SAC ¶¶ 39–40. Squillion and Okaya maintained H1-B visas for their respective candidate. *Id.* Mohammed and Yammanur provided consulting services to CenterLight from 2015 until early March 2018. *Id.* ¶¶ 42–43. During this period, CenterLight paid Talon $125 and $120 per hour for their respective services, consistent with the SOW governing each assignment. *Id.* ¶¶ 41–42.

In March 2018, CenterLight informed Talon that it was terminating the placements of Mohammed and Yammanur effective March 9, 2018. *Id.* ¶ 43. However, without notifying Talon or explicitly availing itself of the Second Agreement's section 4 safe harbor, CenterLight continued to employ Mohammed and Yammanur through Squillion and Okaya. *Id.* ¶¶ 44–49.

Talon alleges that CenterLight could not have employed Mohammed and Yammanur on its own because CenterLight did not possess those employees' H-1B visas, which were held exclusively by Squillion and Okaya. *Id.* ¶ 48. Talon alleges that CenterLight has continued paying Squillion and Okaya for Mohammed's and Yammanur's services, but that, since CenterLight's March 9, 2018 notice to Talon that it was purportedly terminating the placements of the two, CenterLight has not paid Talon a placement fee or the hourly rate set out in the SOW for their services. *Id.* ¶¶ 43–44, 50–51. On July 31, 2019, Talon's counsel sent letters demanding compensation to CenterLight, stating that CenterLight was in breach of its First

Agreement with Talon.  *Id.* ¶ 55.  On September 19, 2019, Talon sent a similar letter to Squillion and Okaya, stating that they were in breach of their Subcontractor Agreements.  *Id.* ¶¶ 55–56.  In each, Talon demanded payment.  *Id.* ¶ 57.

### 3. Talon's Second Amended Complaint

Talon's Second Amended Complaint ("SAC") contains four counts, each against all three defendants.

Count One, for breach of contract, alleges that CenterLight breached both the First Agreement and Second Agreement when it continued to retain Mohammed and Yammanur through Squillion and Okaya without paying Talon for their services.  *Id.* ¶¶ 59, 62–63.  It alleges that Squillion and Okaya breached the non-compete provisions of their Subcontractor Agreements by directly providing services to a client, CenterLight, whom they had previously served through Talon.  *Id.* ¶¶ 60–61, 64–64.

Count Two, for breach of the implied covenant of good faith and fair dealing, alleges that the defendants denied Talon its right to receive payment for staffing services it provided.  *Id.* ¶¶ 67–74.

Count Three, for tortious interference with contractual relations, alleges that each defendant tortiously interfered with Talon's contractual relationships with the others.  It alleges that each knew or should have known that the others were bound by restrictions and non-compete provisions through their contracts with Talon, and yet arranged to secure Mohammed's and Yammanur's services for CenterLight without paying Talon.  *Id.* ¶¶ 75–87.

Count Four, for unjust enrichment, alleges that CenterLight was unjustly enriched by retaining Mohammed's and Yammanur's services without having to compensate Talon, and that Squillion and Okaya were unjustly enriched by retaining the full fees for these staffing services.  *Id.* ¶¶ 88–93.

### B.      Procedural History

On January 6, 2020, Talon filed the Complaint, Dkt. 1, and on January 14, 2020, the First

Amended Complaint, Dkt. 15.  On April 17, 2020, CenterLight filed a motion to dismiss.

Dkt. 23.  On April 23, 2020, the Court issued an order giving Talon until May 8, 2020, to file any

amended complaint in response to that motion.  Dkt. 30.  On May 7, 2020, Okaya filed a motion

to dismiss.  Dkt. 37.  After receiving an extension of time, Dkt. 35, on May 22, 2020, Talon filed

the SAC, the operative complaint today.  On June 12, 2020, CenterLight filed a single motion to

dismiss and for sanctions, Dkt. 47, a supporting memorandum of law, Dkt. 49 ("CenterLight

Mem."), and the Hsi Declaration.  On June 22, 2020, Okaya filed a single motion to dismiss and

for sanctions, Dkt. 51, a supporting memorandum of law, Dkt. 54 ("Okaya Mem."), and the

Roddam Declaration.  On July 17, 2020 Talon filed a memorandum in opposition.  Dkt. 61 ("Pl.

Opp'n").  On July 31, 2020, CenterLight and Okaya each filed a reply.  Dkts. 62 ("CenterLight

Reply"), Dkt. 65 ("Okaya Reply").  In CenterLight's Reply, it withdrew its motion for sanctions.

*See* CenterLight Reply at 2 n.1.  Squillion has not appeared or answered the SAC; with the

deadline to do so having expired, it is in default.

## II.      Legal Standards

### A.      Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough

facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly

dismissed where, as a matter of law, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  For the purpose of resolving a

motion to dismiss, the Court must assume all well-pled facts to be true, drawing all reasonable inferences in favor of the plaintiff. See *Koch*, 699 F.3d at 145. That tenet, however, "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

**B. Relevant Aspects of Contract Law**

The agreements between CenterLight and Talon are governed by New York law. *See* First Agreement at 3; Second Agreement § 17. Under it, a claim for breach of contract requires "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (quotation omitted); *see also Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 806 (2d Dep't 2011) (same). "Under New York law, written agreements are construed in accordance with the parties' intent and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'" *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (2013) (quoting *Greenfield v. Philles Recs.*, 98 N.Y.2d 562, 569 (2002)).

In construing a New York contract, "[i]f a contract is unambiguous on its face, its proper construction is a question of law." *Metro. Life Ins. Co. v. RJR Nabisco. Inc.*, 906 F.2d 884, 889 (2d Cir. 1990). "Whether a writing is ambiguous is a question of law for a court, while the meaning of an ambiguous contract is a question of fact for a factfinder." *Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001) (citation omitted). Contract terms are ambiguous if they are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of

the customs, practices, usages and terminology as generally understood in the particular trade or business." *Olin Corp. v. Am. Home Assurance Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (citation omitted).

The Subcontractor Agreement between Talon and Okaya is governed by New Jersey law. *See* Subcontractor Agreement § 16.  Under it, a claim for breach of contract requires "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Hylton v. J.P. Morgan Chase Bank, N.A.*, 338 F. Supp. 3d 263, 283 (S.D.N.Y. 2018) (quoting *Baymont Franchise Sys., Inc. v. R S Hosp., LLC*, No. 15 Civ. 4067 (WHW), 2018 WL 3410031, at *2 (D.N.J. July 12, 2018)).

In construing a contract under New Jersey law, "whether the contractual term at issue is clear or ambiguous . . . is a question of law." *Doynow Sales Assocs., Inc. v. Rocheux Int'l of N.J., Inc.*, 647 F. Supp. 2d 296, 306 (S.D.N.Y. 2009) (quoting *Vanguard Prop. Grp. v. Trocki*, 2009 WL 465534, at *5 (N.J. Super. Ct. App. Div. Feb. 26, 2009)).  "[T]he interpretation of a contract's terms is ordinarily a legal question for courts to decide," including on a motion to dismiss.  *Klein v. Budget Rent a Car Sys., Inc.*, No. 12 Civ. 7300 (JLL), 2013 WL 1760557, at *6 (D.N.J. Apr. 24, 2013); *see also Doynow*, 647 F. Supp. 2d at 306 ("Under New Jersey law, when a contract is unambiguous, resolution by summary judgment is appropriate." (cleaned up) (quoting *Hepps v. Sgouros*, 2007 WL 4441414, at *3 (N.J. Super. Ct. App. Div. Dec. 20, 2007))).  "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 283 (D.N.J. 1992), *aff'd*, 993 F.2d 877 (3d Cir. 1993).

## III. Analysis

The Court first considers CenterLight's motion to dismiss, and then Okaya's motion to dismiss and for sanctions.

### A. Claims Against CenterLight

#### 1. Breach of Contract

Talon alleges that CenterLight breached the First Agreement by failing to inform Talon when it extended job offers to personnel supplied by Talon and to pay Talon for candidates who learned of job opportunities at CenterLight as a result of Talon's efforts. SAC ¶¶ 59, 63. In moving to dismiss, CenterLight argues that (1) the Second Agreement, via its integration clause, overtook the First Agreement; and (2) on the facts pled, it has not violated any provision of the Second Agreement. CenterLight Mem. at 10–12.

CenterLight's first argument fails. As Talon correctly explains in its response to CenterLight's motion, see Pl. Opp'n at 11–12, the Agreements govern different subject matters, such that the integration clause in the Second Agreement does not nullify the First Agreement. The First Agreement governs Talon's recruitment of candidates *for permanent employment at CenterLight*. It thus requires CenterLight to notify Talon of the status of employment negotiations and to pay Talon a 20% "recruitment fee" when CenterLight "hire[d] any candidate who learned of the [CenterLight] job opportunity through the direct efforts of [Talon]." First Agreement at 1–2; SAC ¶ 59. These provisions address the process by which Talon was to refer candidates to be hired directly and permanently by CenterLight. *See* First Agreement at 1–2 (listing Talon's responsibilities in assisting with the referral and hiring process in exchange for 20% of the first year's base salary).

In contrast, the Second Agreement governs only *the temporary placement at CenterLight of employees of Talon* (or of Talon's subcontractors).  To that end, it sets out a mechanism for Talon to provide candidates, who would perform services to CenterLight pursuant to SOWs, with CenterLight reimbursing Talon at an agreed-upon rate.  SAC ¶¶ 25–26; Second Agreement § 3.  That these employees are expressly temporary is clear from section 4, "Temp to Perm Placement."  It provides that if a candidate placed by Talon were to apply for and be selected to fill a permanent position at CenterLight, whether CenterLight owed fees to Talon—unlike in the First Agreement—would depend on the length of the candidate's tenure, to that point, at CenterLight.  Second Agreement § 4.

The Second Agreement's integration clause thus is not triggered.  That clause would have negated the First Agreement only if the two agreements had covered the same "subject matter." It provides: "There are no other agreements, oral or written, between the parties with respect to the subject matter of this Agreement, and all oral and written correspondence relating to the subject matter hereof is superseded by this Agreement."  Because the First Agreement (which had been executed just five days earlier) addressed a different subject matter, it survives the integration clause.  *See, e.g.*, *FlightSafety Int'l, Inc. v. Flight Options, LLC*, 194 F. App'x 53, 55 (2d Cir. 2006) (summary order) ("The merger clause in the [second] Contract covers all prior agreements between the two parties 'with respect to its subject matter.'  It is not clear that the two contracts were viewed by the parties as the same 'subject matter.' . . . [W]e cannot conclude as a matter of law that the [second] Contract's merger clause acted as a release of any and all [plaintiff's] rights or remedies under the [first] Contract[.]"); *Kreiss v. McCown DeLeeuw & Co.*, 37 F. Supp. 2d 294, 301 (S.D.N.Y. 1999) (second contract only superseded aspects of first contract that covered the same subject matter as the second contract); *Globe Food Servs. Corp. v.*

*Consol. Edison Co. of N.Y.*, 184 A.D.2d 278, 280 (1st Dep't 1992) (second contract did not supersede first "in the absence of more definitive language . . . , *e.g.*, 'a revocation and cancellation of the prior agreement' [or] 'supersedes' any prior agreement" and where "the later contract did not deal with precisely the same subject matter as the earlier contract").

The Court turns next to whether the SAC plausibly pleads a violation of either agreement in connection with the services of Mohammed and Yammanur.

The First Agreement, governing Talon's placement of permanent employees at CenterLight, is clearly inapposite. That is because the SAC accuses CenterLight of continuing to temporarily engage these two workers through Talon's erstwhile subcontractors. *See* SAC ¶¶ 46–52. But it nowhere alleges that CenterLight directly—or permanently—employed Mohammed or Yammanur.

As to the Second Agreement, Talon argues that CenterLight breached (1) the Mutual Non-Solicitation provision (section 14) by soliciting for employment Mohammed and Yammanur, because each was "engaged in or became known to" CenterLight through Talon, and (2) the "Temp to Perm Placement provision" (section 4), by failing to notify Talon of the hiring. *See* SAC ¶¶ 28, 59, 63; Pl. Opp'n at 12. And, Talon argues, although the Second Agreement contains a non-exclusivity provision (section 15) that authorizes CenterLight to work "generally" with Talon's competitors, it does not permit CenterLight to engage—without paying Talon as required by the Second Agreement—personnel whom Talon had provided to CenterLight. *See* Pl. Opp'n at 14.

The SAC does not, however, plausibly plead a violation of either section 4 or section 14. And, contrary to Talon's argument, section 15 explicitly allowed CenterLight to engage Mohammed and Yammanur for temporary consultant services through Squillion and Okaya.

As to section 4, the Temp to Perm Placement provision, which requires CenterLight to pay Talon a 20% "placement fee," it is limited to a distinct scenario: in which CenterLight hires, on a permanent basis, temporary personnel whom Talon had placed with CenterLight. *See* Second Agreement § 4 ("CenterLight finds it necessary to hire personnel from time to time. Should [Talon]'s personnel apply and be selected for such vacancy, CenterLight shall pay a placement fee to [Talon] . . . ."). That provision, by its terms, does not give rise to liability on CenterLight's part where, as alleged, CenterLight was continuing the temporary employment of Mohammed and Yammanur through their employers, Squillion and Okaya.[3]

As to section 14, the Mutual Non-Solicitation provision, which prohibits CenterLight from "solicit[ing] for employment any employee of the other party who was engaged in or became known to the other as a result of the performance of such SOW," it, too, is irrelevant to this dispute. The provision applies to "employees," which the Second Agreement elsewhere uses to refer to employees of the entity at issue. *See id.* § 11 ("Neither [Talon] nor any of its agents will be entitled to any of the benefits which CenterLight may make available to its employees, such as group insurance, profit-sharing, or retirement benefits."). It does not apply to "personnel," a broader term which the Second Agreement uses throughout to refer to persons placed by Talon. *See id.* §§ 4, 6, 7(e), 8(c), 11. Section 14 thus applies only to CenterLight's solicitation of Talon's own employees, rather than employees of subcontractors such as Squillion

[3] CenterLight separately argues that it could not be liable for the placement fee under section 4 because Yammanur had been working at CenterLight since 2015, years outside the 17-week mark beyond which CenterLight need not pay a placement fee for converting a temporary employee to a permanent one. CenterLight Mem. at 11. Talon counters that this safe harbor does not apply where, as is alleged here, CenterLight did not give Talon notice, as required by section 4. Because section 4 is inapplicable to CenterLight's continuation of temporary hires through a subcontractor, the Court does not have occasion to resolve this question.

and Okaya, or other non-employees of Talon that Talon helped place.  *See also Employee*, Black's Law Dictionary (11th ed. 2019) (defining "employee" as "[s]omeone who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance").  The SAC does not allege that Mohammed and Yammanur were employees of Talon.

In any event, section 15, the Second Agreement's Non-Exclusivity provision, by its plain language permits CenterLight to take the actions the SAC alleges.  In broad terms, it authorizes CenterLight to "engage the services of *any individual or entity* that competes with [Talon] or offers services similar to those offered by [Talon]."  *Id.* § 15 (emphasis added).  The provision does not exclude personnel whom Talon had earlier placed at CenterLight.  By its express terms, the provision allows CenterLight to retain Mohammed and Yammanur, through Squillion and Okaya, after the termination of the SOWs relating to them.  And Talon does not point to any other provision that forbids CenterLight from resuming the temporary retention of persons earlier placed by Talon, with the placement this time by a competitor.

Accordingly, the SAC does not plausibly allege the breach by CenterLight of a provision of either agreement.  The Court dismisses Talon's breach-of-contract claim against CenterLight for failure to state a claim.  *See, e.g.*, *Negrete v. Citibank, N.A.*, 759 F. App'x 42, 46 (2d Cir. 2019) (summary order) (dismissing "claims for breach of contract" where "nothing . . . [was] alleged to have occurred" that would have breached the terms of the contract); *Chachkes v. David*, No. 20 Civ. 2879 (LJL), 2021 WL 101130, at *9 (S.D.N.Y. Jan. 12, 2021) ("Plaintiff has not met the pleading standard to state a claim for breach of contract because he has not adequately alleged facts that would make out [a breach.]"); *Milligan v. GEICO Gen. Ins. Co.*, No. 16 Civ. 240 (DLI), 2020 WL 5878406, at *5 (E.D.N.Y. Sept. 30, 2020) (dismissing breach of contract claim

where facts alleged "did not breach the policy"); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F. Supp. 2d 405, 416 (S.D.N.Y. 2009) (dismissing breach of contract claim where plaintiff failed to "adequately plead facts showing that [defendant] breached the terms of the contract").

**2. Good Faith and Fair Dealing**

CenterLight next moves to dismiss Talon's claim for breach of the implied covenant of good faith and fair dealing as identical to the breach of contract claim and thus redundant under New York law. CenterLight Mem. at 12–14. Talon responds that the claims are distinct, in that its breach-of-contract claim arises from a breach of "the restrictions that precluded CenterLight and Okaya from working with one another concerning personnel that Talon provided," whereas the breach of implied covenant claim arises from "CenterLight's efforts to duplicitously squeeze Talon out of the picture and to work directly with Okaya and/or Squillion . . . irrespective of any express contractual provision." Pl. Opp'n at 15–16.

Under New York Law, where claims of a breach of contract and a breach of the implied covenant of good faith and fair dealing are duplicative, the latter are properly dismissed on a motion to dismiss. *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015). Such "claims are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'" *Id.* (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.*, 70 A.D.3d 423, 426 (1st Dep't 2010)); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." (citation omitted)); *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012) (dismissing breach of implied covenant of good faith and fair dealing where a breach of contract claim "based upon the same facts" was also pled).

Here, notwithstanding that one claim is premised (errantly) on contractual provisions and one is not, both the contract and implied-covenant claims arise from the same factual allegations: that CenterLight purportedly cut out Talon and worked directly with Squillion and Okaya to engage Mohammed and Yammanur. The claims seek identical damages: the payments to which, had the Second Agreement applied to CenterLight's acquiring temporary workers via these two subcontractors of Talon, Talon would have been entitled. As such, Talon's claim for breach of the implied covenant against CenterLight is dismissed. It duplicates the breach-of-contract claim and does not identify a legal basis under which, given that the Second Agreement did not give Talon the rights it claimed, CenterLight's conduct would be actionable under an implied-covenant theory. *See, e.g.*, *Negrete*, 759 F. App'x at 46–47 (dismissing claims for breach of contract and for breach of the implied covenant of good faith and fair dealing where "[t]he claims for breach of the covenant are expressly based on the same facts underlying the breach of contract claims" and thus "were duplicative"); *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, No. 20 Civ. 4370 (DLC), 2020 WL 7405262, at *10–11 (S.D.N.Y. Dec. 16, 2020) ("[T]he claim for a violation of the implied duty therefore mirrors [plaintiff's] breach of contract claim and is dismissed"); *Benihana of Tokyo, LLC v. Angelo, Gordon & Co., L.P.*, 259 F. Supp. 3d 16, 37 (S.D.N.Y. 2017) (dismissing claim for breach of the implied covenant where it "impermissibly duplicate[d] [plaintiff's] breach of contract claim"); *INTL FCStone Mkts., LLC v. Corrib Oil Co.*, 172 A.D.3d 492, 493 (1st Dep't 2019) (finding breach of contract claim "correctly dismissed," "[n]or can plaintiff's express obligations be varied by the assertion of a claim of breach of the covenant of good faith and fair dealing").

### 3.      Tortious Interference

CenterLight next moves to dismiss the SAC's claim for tortious interference with Talon's contractual relationships with Squillion and Okaya.  It argues that the SAC does not adequately allege that CenterLight had actual knowledge of the contracts or terms that Talon claims Squillion and Okaya were breaching by arranging Mohammed's and Yammanur's renewed temporary placements at CenterLight, to wit, the covenants against competition in Talon's agreements with Squillion and Okaya.  CenterLight Mem. at 14–15.  It further argues that the SAC does not plead that CenterLight intentionally procured those breaches.  *Id.* at 16.  Talon defends the SAC's allegations of CenterLight's awareness of the contract terms at issue and its intentional procurement of their breach, and argues that under New York law, the SAC properly pleads tortious interference.  Pl. Opp'n at 16–18.

Under New York law, a tortious-interference claim requires: "(1) the existence of a valid contract between the plaintiff and a third party, (2) defendant's knowledge of that contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom."  *Rich v. Fox News Network, LLC*, 939 F.3d 112, 126–27 (2d Cir. 2019) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 425 (1996)).  With regard to the second element, a defendant must "have some knowledge of the terms and conditions of the allegedly-interfered-with contract but perfect or precise knowledge is not required."  *State St. Glob. Advisors Tr. Co. v. Visbal*, 431 F. Supp. 3d 322, 349 (S.D.N.Y. 2020).  And the plaintiff must allege that the defendant "was aware of the limitations they imposed on [plaintiff's counterparties]."  *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008).  Specifically, a "[p]laintiff must allege that the defendants had *actual* knowledge; an allegation that they 'should have known' of the existence

of the contract is insufficient." *Taboola, Inc. v. Ezoic Inc.*, No. 17 Civ. 9909 (PAE) (KNF), 2020 WL 1900496, at *9 (S.D.N.Y. Apr. 17, 2020) (quoting *AA Tube Testing Co. v. Sohne*, 20 A.D.2d 639, 639 (2d Dep't 1964) (emphasis in original)).  An "allegation[] that [defendants] 'knew or should have known' about the contracts . . . is mere speculation," insufficient to survive a motion to dismiss.  *Medtech Prods. Inc.*, 596 F. Supp. 2d at 814.

The SAC fails to meet these standards.  It does not adequately allege that CenterLight had actual knowledge of the contractual obligations between Talon and Squillion and Okaya, which the placement of the two temporary employees stood to breach.  To be sure, the SAC generally avers that CenterLight "was made aware of Talon's Subcontractor Agreements with Squillion and Okaya."  SAC ¶ 80; *see also id.* ¶ 85 ("[D]espite [CenterLight's] knowledge of Talon's Subcontractor Agreements with Squillion and Okaya . . . .").  But there are no specifics.  And, by elsewhere merely pleading that CenterLight "was aware, or should have been aware," of those provisions, *id.* ¶ 81, the SAC implicitly acknowledges that CenterLight was not actually aware of the limitations placed upon Squillion and Okaya by the restrictions and non-compete provisions in their contracts with Talon.  Under the case law above, such allegations afford only "mere speculation" that CenterLight knew about the restrictions and non-compete provisions in the Subcontractor Agreements with which the SAC alleges CenterLight tortiously interfered. *Medtech Prods. Inc.*, 596 F. Supp. 2d at 814; *see, e.g.*, *A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, No. 12 Civ. 4828 (KPF), 2018 WL 1273343, at *11 (S.D.N.Y. Mar. 5, 2018) ("General allegations that a party 'knew or should have known' about the contract in question fall short" of the requirements of a tortious-interference claim.); *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 626–27 (S.D.N.Y. 2014) (dismissing claim where "allegations are inconsistent with the pleading of 'actual knowledge'"); *Burrowes v. Combs*, 25 A.D.3d 370, 373 (1st Dep't

2006) ("[T]o avoid dismissal of a tortious interference with contract claim a plaintiff must support his [or her] claim with more than mere speculation."). The Court therefore dismisses Talon's tortious-interference claim against CenterLight.

**4. Unjust Enrichment**

CenterLight moves to dismiss Talon's final claim against it, for unjust enrichment. It notes that, under New York law, such quasi-contract claims are considered duplicative, and thus unavailable, where a valid, enforceable contract defines the parties' obligations. CenterLight Mem. at 16–18. Talon counters by citing New York authority that a plaintiff can allege unjust enrichment in the alternative where there is a dispute as to the existence of a bona fide contract. Pl. Opp'n at 18–19.

"To state a claim for unjust enrichment in New York, a plaintiff must allege that (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendants to make restitution." *Kidz Cloz, Inc. v. Officially for Kids, Inc.*, 320 F. Supp. 2d 164, 177 (S.D.N.Y. 2004) (citation omitted). However, "[u]njust enrichment is not a catchall cause of action to be used when others fail"—and such a claim "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012). Instead, unjust enrichment "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.*; *see also Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 484 (S.D.N.Y. 2014) (dismissing unjust enrichment claim where "[p]laintiff simply restate[d] elements of other claims"). "The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes

recovery in quasi contract for events arising out of the same subject matter," *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388 (1987), even where ultimately the defendant's actions are found not to have breached the contract, *see EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 22–23 (2005).

These principles require dismissal here.  Although the conduct alleged in the SAC does not make out a breach by CenterLight of its Second Agreement with Talon, there is indisputably a valid contract between the two governing the subject matter at issue: Talon's placement of temporary employees at CenterLight.  That agreement does not prohibit—indeed it appears squarely to allow—CenterLight to obtain staffing from Talon's competitors, including persons that Talon previously placed with CenterLight.  This valid and enforceable written contract precludes a quasi-contract claim here.  The Court accordingly dismisses Talon's unjust-enrichment claim against CenterLight.  *See, e.g.*, *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." (quoting *Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 388)); *Dominick & Dickerman LLC v. Deutsche Oel & Gas AG*, 756 F. App'x 58, 62 (2d Cir. 2018) (summary order) (same); *Green Tree Servicing, LLC v. Christodoulakis*, 689 F. App'x 66, 71 (2d Cir. 2017) (summary order) (Unjust-enrichment claims are precluded "whenever there is a valid and enforceable contract governing a particular subject matter, whether that contract is written, oral, or implied-in-fact." (quoting *Isr. Med. Ctr.*, 448 F.3d at 587)); *Buonasera v. Honest Co., Inc.*, 208 F. Supp. 3d 555, 568 (S.D.N.Y. 2016) ("Because Buonasera fails to show how the unjust enrichment claim is not duplicative, it should be dismissed.").

### B.      Claims Against Okaya

#### 1.      Breach of Contract

The SAC alleges that Okaya breached the Covenant Against Competition in its Subcontractor Agreement with Talon, by arranging for Yammanur to work for CenterLight through Okaya without going through Talon.[4]  SAC ¶ 58–66.  In response, Okaya primarily makes a factual representation, that it had stopped working with Yammanur and CenterLight after March 9, 2018.  Okaya Mem. 11–13.  In support, it attaches copies of emails between the parties that purport to so show.  *See* Roddam Decl., Exs. D–F.

Okaya's attempt to obtain dismissal on this basis is improper.  It is black-letter law that a factual rebuttal, where based on non-cognizable materials, is inappropriate on a motion to dismiss based on Rule 12(b)(6).  *See, e.g.*, *Ray v. Weit*, 708 F. App'x 719, 722 (2d Cir. 2017) ("In any event, a factual dispute . . . could not have been resolved on a motion to dismiss under Rule 12(b)(6)."); *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 405 (2d Cir. 2015) (resolution of factual dispute inappropriate on motion to dismiss); *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp.*, 343 F.3d 189, 197 (2d Cir. 2003) (similar).  Okaya does not cite any authority countenancing this breach of first principles of federal practice.  Nor does, or can, Okaya claim that the materials it has supplied are cited in or incorporated by reference in the SAC.  *See* Okaya Reply 3–5.[5]

---

[4] The parties' papers appear inconsistent on whether Yammanur was working for Okaya, who was retained directly by CenterLight, *see* SAC ¶¶ 40, 46–52; Pl. Opp'n at 6–9, or whether Yammanur was working for Squillion, which supplied him to Okaya via a purchase order, *see* Okaya Mem. at 7–8.  On a motion to dismiss, the Court treats as accurate the facts pled in the SAC.  Regardless, this nicety would not change the outcome of this decision.

[5] In any event, the emails that Okaya attaches appear to show only that Yammanur completed the project that he was working on as a subcontractor for Talon on March 9, 2018.  They do not

To the limited extent that Okaya challenges the SAC's breach-of-contract claim by proper means, Okaya terms the claim a mere "formulaic recitation of the elements." Okaya Reply at 6. That anemic challenge, made only in a reply brief,[6] fails. The SAC pleads sufficient factual content as to the existence of contract between Okaya and Talon, and that Okaya breached that contract by placing Yammanur with CenterLight in a manner that cut Talon out, to withstand Okaya's Rule 12(b)(6) motion. The SAC specifically notes section 11 of the Subcontractor Agreement, which prohibited Okaya from "directly or indirectly[] solicit[ing] or provid[ing] services to any customer . . . for whom [Okaya] provided services through [Talon] under this Agreement." SAC ¶ 61. The SAC alleges that by providing Yammanur's services directly to CenterLight and cutting out Talon, Okaya breached that provision. *Id.* ¶ 64. This allegation is sufficiently specific to state a claim. The Court accordingly denies Okaya's motion to dismiss Talon's breach-of-contract claim.

### 2. Good Faith and Fair Dealing

Like CenterLight, Okaya moves to dismiss the SAC's claim for breach of the implied covenant of good faith and fair dealing as identical, and thus redundant, to the breach-of-contract claim against it. Okaya Mem. at 13–14. On this point, Okaya is correct. Talon has brought a viable breach-of-contract claim, and its implied-covenant claim against Okaya "arise[s] from the same facts" (Okaya's cutting out Talon and continuing to place personnel with CenterLight directly) and "seek[s] the identical damages" (the payments Talon should have received from the

---

establish the factual proposition Okaya advances in its briefs, that Yammanur did not work for Okaya or CenterLight afterwards.

[6] That itself would be a basis to disregard this argument. "It is well established, of course, that arguments first raised in reply briefs are forfeited or waived." *Chevron Corp. v. Donziger*, 325 F. Supp. 3d 371, 379 (S.D.N.Y. 2018); *see also Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y.1997) (collecting cases), *aff'd*, 159 F.3d 1347 (2d Cir. 1998).

placement of Yammanur) as Talon's breach-of-contract claim does. *Deutsche Bank Nat'l Tr. Co.*, 810 F.3d at 869.[7] Accordingly, the Court dismisses the SAC's claim for breach of the implied duty of good faith and fair dealing against Okaya as redundant of the contract claim. *See id.* (dismissing claim for breach of implied covenant as duplicative of breach-of-contract claim).

**3. Tortious Interference**

Okaya moves to dismiss the SAC's claim against it for tortious interference with Talon and CenterLight's contractual relationship. Okaya argues that the SAC does not adequately allege its actual knowledge of CenterLight's contractual duties to Talon, *see* Okaya Mem. at 15–16, or that it intentionally procured CenterLight's breach, *id.* at 16.

Much as the SAC's similar claim against CenterLight failed, so too does its claim against Okaya, as the SAC does not adequately allege Okaya's "actual knowledge" of the contractual limitations on its counterparty, CenterLight. *Medtech Prods. Inc.*, 596 F. Supp. 2d at 797; *see id.* at 814. The SAC alleges generally that Okaya was "aware of Talon's Consulting Agreement with [CenterLight]." SAC ¶ 82; *see also id.* ¶ 84 ("Despite Squillion's and/or Okaya's knowledge of Talon's agreements with [CenterLight] . . . ."). But it is devoid of specifics. Far

---

[7] As discussed above, Okaya's Subcontractor Agreement contains a choice-of-law provision selecting New Jersey law. *See* Subcontractor Agreement § 16. But both Okaya and Talon rely exclusively on New York law in their briefing on Talon's claims against Okaya. *See* Okaya Mem. at 13 ("Talon's breach of the implied covenant of good faith and fair dealing claim is duplicative and must be dismissed under New York law."), 16 ("[U]nder New York law, Talon was required to plead actual knowledge" to establish tortious interference.), 17 (arguing unjust-enrichment claim should be dismissed because it is "defective under well-established New York law"); Pl. Opp'n at 11–19; Okaya Reply at 6–9. Generally, where "[t]he parties' briefs assume that New York substantive law governs the issues presented, . . . such implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 274 F.3d 509, 514 n.4 (2d Cir. 2001)); *see Krume v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000). Accordingly, the Court "follow[s] their lead" and applies New York law to Talon's claims against Okaya. *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).

from pleading Okaya's awareness of the pertinent restrictions and non-compete provisions in the CenterLight agreements, it merely claims that Okaya "[was] aware, or should have been aware," *id.* ¶ 83, of those provisions. Such allegations fail because it must be pled, non-conclusorily, that the defendant knew of the provisions with which it was interfering. *See, e.g.*, *Taboola, Inc.*, 2020 WL 1900496, at *11 ("Allegations that [defendant] 'should have known' or 'could have known' of the contracts' terms by virtue of their accessibility do not adequately plead [its] knowledge."); *Medtech Prods. Inc.*, 596 F. Supp. 2d at 814 (finding inadequate "general claim of [defendant's] knowledge of the contracts").

The Court accordingly dismisses Talon's claim for tortious interference against Okaya.

**4. Unjust Enrichment**

Finally, Okaya moves to dismiss the SAC's claim of unjust enrichment, again on the ground that this quasi-contract claim is unavailable where there is a valid, enforceable contract. Okaya Mem. at 16–17. For the same reasons that required the dismissal of the SAC's unjust-enrichment claim against CenterLight, its unjust-enrichment claim against Okaya fails. There was undisputedly a valid and enforceable Subcontractor Agreement in place between Okaya and Talon which governed the matter at issue, and indeed, the SAC has plausibly alleged a breach of that agreement by the very conduct on which the unjust-enrichment claim is based. The Court therefore dismisses this claim, too. *See Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 388.

**C. Okaya's Sanctions Motion**

In a move that can only be called audacious given its own disobedience in support of dismissal, Okaya has moved for sanctions, under Federal Rule of Civil Procedure 11(c), based on Talon's "frivolous and unsupportable" claims. Okaya Mem. at 17. For two reasons, the Court denies that claim.

First, it is meritless, as such sanctions are warranted only "where it is patently clear that a claim has absolutely no chance of success." *Healey v. Chelsea Res., Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (quoting *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1005 (2d Cir. 1988)).  And although the Court has dismissed several of Talon's claims against Okaya, it has sustained the central breach-of-contract claim, and dismissed two of the other three because they could not coexist with that claim.

Second, Okaya's motion for sanctions is procedurally improper.  Under the plain language of Rule 11(c)(2), a motion for Rule 11 sanctions "must be made separately from any other motion," Fed. R. Civ. P. 11(c)(2), and a "request for sanctions included in a memorandum addressing the underlying issues before the district court" cannot satisfy this requirement, *see Perpetual Sec., Inc. v. Tang*, 290 F.3d 132, 142 (2d Cir. 2002) (cleaned up) (reversing award of sanctions for lack of separate motion); *see* Okaya Mem. at 9, 17–18 (including in merits brief the request for sanctions).  Okaya's motion for Rule 11 sanctions is therefore denied.  *See, e.g.*, *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d Cir. 2008) (affirming denial of defendants' Rule 11 motion where defendants "failed to make a separate motion for sanctions under Rule 11, and therefore failed to comply with the procedural requirements of the rule"); *Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 415 (S.D.N.Y. 2016) ("[D]efendants' request for attorneys' fees under Rule 11 was made together with the motion to dismiss rather than as a separate motion, and for that reason alone it must be denied."); *Banfield v. UHS Home Attendants, Inc.*, No. 96 Civ. 4850 (JFK), 1997 WL 342422, at *3 (S.D.N.Y. June 23, 1997) (denying motion for sanctions "[b]ecause Plaintiff failed to comply with either of Rule 11's procedural requirements").

**CONCLUSION**

For the foregoing reasons, the Court grants CenterLight's motion to dismiss in its entirety, and grants Okaya's motion to dismiss Talon's implied-covenant, tortious-interference, and unjust-enrichment claims. The Court denies Okaya's motion to dismiss Talon's breach-of-contract claim. The Clerk of Court is respectfully directed to terminate the motions pending at dockets 23, 26, 47, 50, and 51, and to terminate CenterLight as a defendant in this case.

The Court schedules an initial pretrial conference with the parties remaining in the case for May 3, 2021, at 2 p.m. This conference will be held telephonically. Counsel are directed to review the Court's Emergency Individual Rules and Practices in Light of COVID-19, found at https://nysd.uscourts.gov/hon-paul-engelmayer, for the Court's procedures for telephonic conferences. Counsel are further directed to prepare a Civil Case Management Plan and joint letter in accordance with the Court's Individual Rules, to be submitted to the Court no later than April 28, 2021.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: March 30, 2021
New York, New York